408 So.2d 1302 (1982)
STATE of Louisiana
v.
Jerome WEST.
No. 81-KA-1657.
Supreme Court of Louisiana.
January 25, 1982.
*1303 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Lindsay Larson, Louise S. Korns, John H. Craft, Asst. Dist. Attys., for plaintiff-appellee.
Ralph S. Whalen of Oestreicher & Whalen, New Orleans, for defendant-appellant.
CALOGERO, Justice.[*]
The Orleans Parish Grand Jury indicted defendant Jerome West, along with Wendell *1304 McDonald, for the first degree murder of a 21-year old female college student, one Robyn Seymour, a violation of La.R.S. 14:30. The trial judge had granted McDonald's motion for severance of the trials.[1] Following West's trial, the jury found him guilty of second degree murder. While the minutes included in the record transmitted for review are apparently incomplete, the trial judge apparently sentenced defendant in accordance with the statute: life imprisonment without benefit of parole, probation or suspension of sentence for 40 years.[2] Defendant appeals his conviction on the basis of three assignments of error.
The state's evidence linking defendant to the crime consisted primarily of defendant's fingerprints, which were found at the scene of the crime, and his inculpatory statements. In these statements, defendant told of going with McDonald to get some money, of being with McDonald when McDonald robbed the victim, of driving McDonald's car while McDonald drove in the victim's car to a location away from the scene of the robbery, of waiting in McDonald's car while McDonald led the victim away then returned to her car with her, of McDonald's instructing the victim to remain there until he and defendant had left, of McDonald's pulling the car into a driveway, turning around and driving alongside the victim's car a second time, and of McDonald's shooting into the victim's car.[3]
By his first assignment of error, defendant contends that the evidence shows that defendant did nothing more than find himself in the company of McDonald who committed the crimes. On the other hand, the state's effort to prove that defendant was guilty of more than second degree murder as just a principal to an armed robbery during which the victim was killed, was not successful for the jury found defendant guilty of only second degree murder, thereby acquitting him of first degree (specific intent) murder.
Defendant argues that the record is devoid of any evidence whatsoever connecting him with the killing or the armed robbery, and that nothing indicates any intention by the defendant to be part of the activities. Defendant correctly states that the proper standard of review of the sufficiency of evidence was enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under Jackson, a reviewing court is to view "the evidence in the light most favorable to the prosecution" to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573 (emphasis in the original); State v. Edwards, 400 So.2d 1370 (La.1981).
Applying this standard to the case at bar, we find that the jury could have found the essential elements of the crime of second degree murder beyond a reasonable doubt. Defendant's fingerprints were found on the car in which the victim was shot. His fingerprints were also found on *1305 an index card among the scattered contents of her purse across the street from her home, the location where her car was parked when she left home. Defendant, himself, in his statements, admitted going with McDonald to get some money and driving McDonald's car, following McDonald and the victim as they drove from her house to the area where she was later shot.
Significantly, the jury did not find defendant guilty of first degree (specific intent) murder. Rather, they returned the responsive verdict of second degree (felony) murder. At the time of this crime, second degree murder was defined as "the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of ... armed robbery ... even though he has no intent to kill". Defendant's fingerprints were found on one of the items taken from the victim's purse and he admitted sufficient particulars of his involvement with McDonald in regard to this incident to establish minimally that he was a principal to armed robbery.
Defendant argues that the killing did not occur in the course of an armed robbery because the robbery occurred several blocks away and had been completed before McDonald shot the victim. We are not persuaded by this line of reasoning. The armed robbery and the shooting which followed constituted essentially a single criminal incident. The offenders never left the victim; instead they escorted her from the scene of the armed robbery to the location where the shooting took place. Under these circumstances it is apparent that the killing occurred as part of the armed robbery.
The trial judge did not err in denying defendant's motion for a new trial. The verdict was supported by the evidence which was sufficient for the jury to have found defendant guilty of second degree murder beyond a reasonable doubt. This assignment lacks merit.
By his second assignment of error, defendant argues that the trial judge erred in admitting into evidence statements made by him on July 31, 1977, and August 9, 1977.
Defendant was arrested on an unrelated charge and was questioned regarding the instant crime while he was incarcerated. At the time of his arrest he was not under suspicion for this crime. In this first statement, defendant told of having seen a nickle-plated pistol at the home of Wendell McDonald's girlfriend on July 8, 1977. He also stated that he had heard Wendell speak of a new Cutlass, but that he had never seen that car although he had seen several other cars which Wendell had from time to time. When asked whether he had seen Wendell with a diamond ring recently, defendant responded that he had seen Wendell wearing a man's diamond cluster ring. At the close of the statement, defendant was asked whether he had been coerced into making the statement or had been struck by anyone, and defendant answered that he had not. He was further asked whether he had been allowed to use the bathroom facilities and have water as needed, to which he replied in the affirmative.
On August 8, 1977, defendant became a primary suspect in the murder of Robyn Seymour and police interrogated him about his part in the crime on August 9, 1977. At that time, defendant related that he was approached by Wendell McDonald in the courtyard of the St. Bernard housing project and that Wendell asked him to take a ride and get some money. Defendant accompanied Wendell who was driving a 1977 silver Cutlass. They drove around until they saw a young woman coming out of "some apartments" and approaching her car. As defendant remained in the Cutlass, Wendell approached her with the silver gun and robbed her of the contents of her purse. McDonald entered the victim's car and instructed defendant to follow in the Cutlass. They drove for a few blocks and then parked the cars beside a park. At the park McDonald led the victim by the hand to *1306 some trees. The victim was pulling down her clothes. Defendant said that he started the car in preparation for leaving and McDonald and the victim came from behind the trees with the victim pulling up her clothes and McDonald fixing his. Defendant continued the statement by saying that after the girl got into her car, Wendell took the wheel of the Cutlass, drove into a driveway to turn around, pulled alongside the victim's still parked car and began shooting.
Defendant's motion to suppress the statements was denied by the trial judge following a hearing. At that hearing only the defense put on evidence. Defendant first called Dr. Ritter, a member of the sanity commission which had examined defendant to determine his competency to stand trial.[4] Dr. Ritter described defendant as suffering from paranoid schizophrenia. Dr. Ritter stated that the disease had begun to manifest itself a number of years prior to the crime with which defendant was charged and the defendant had been hospitalized in the past. During one of these hospitalizations, in 1971, defendant had been administered an I.Q. test on which he scored 58. Dr. Ritter explained that an I.Q. test after symptoms of schizophrenia begin to manifest themselves is not completely accurate and further said that during a period of remission, the functional I.Q. of a schizophrenic may increase by as much as 10 points. Dr. Ritter had not retested defendant for his I.Q. when he examined him as a member of the sanity commission. Dr. Ritter categorized a person with an I.Q. of 58 as being moderately retarded. Dr. Ritter testified that he and another member of the sanity commission had listened to tapes of defendant's statements and that it was their opinion that defendant was sane at the time the tapes were made. He based this opinion on the quality of defendant's answers, which were crisp and to the point. Dr. Ritter stated that he discerned no hesitation and no vagueness on the part of defendant in answering the questions and based upon this, as well as the quality of defendant's answers, he concluded that defendant was not disassociated at the time of making the statements and that his thought processes were in order. Dr. Ritter summarized his testimony by stating that at the time of the statements, defendant seemed to have been in remission.
The prosecutor cross-examined Dr. Ritter and asked if he could determine from the tapes whether defendant's statements had been voluntary. Dr. Ritter replied that he could tell that defendant was capable of responding to questions and that his responses were apparently spontaneous. Although he said that defendant was capable of giving a voluntary statement, Dr. Ritter said that he could not answer whether the statements were in fact voluntary.
Following Dr. Ritter's testimony, defendant took the stand at the hearing on the motion to suppress. Defendant stated that he had been beaten during the taking of the statement. He maintained that he did not remember making a statement and did not remember a tape recorder. Defendant said that the police told him what happened and that he "told them the same thing they told me." When asked by the judge what he meant by this, defendant did not explain, but repeated that they were telling him about the murder and asking if he was with the person who committed the murder. Defendant said that he replied that he was not. Defendant then said that he could not remember any more of what happened, but again repeated that "they were telling me about it." Defendant again asserted that he was being beaten and added that he was crying because he was hurting. The judge asked defendant whether he had reported the beating to anyone and defendant replied *1307 that he had tried to tell the "tier captain" when he returned to parish prison but that this person would not call a doctor for him.
Defense counsel asked defendant whether anyone had told him of his rights, and he asked defendant the meaning of those rights. Defendant replied that having the right to consult with and obtain the advice of an attorney meant that he did not have to say anything until an attorney was present. He also said that if he didn't have the funds to hire an attorney, the court would appoint one for him. Upon further questioning, defendant admitted that it was possible that he had been given his rights before making the statements and that he just didn't remember it. Finally, defendant testified that he had completed the fifth or sixth grade in school.
On cross-examination by the prosecutor, defendant continued to assert that he had been beaten and that he could not remember having made a statement. On redirect, defendant told defense counsel that during the police interrogation he was not asked whether he had been beaten, an assertion which is repudiated by the tapes themselves.
Before a statement can be admitted into evidence, the state must prove that it was freely and voluntarily made. La.R.S. 15:451; State v. Campuzano, 404 So.2d 1217 (La.1981); State v. Petterway, 403 So.2d 1157 (La.1980); State v. Haynie, 395 So.2d 669 (La.1981); State v. Castillo, 389 So.2d 1307 (La.1980). If the statement was made during custodial interrogation, the state must also show that the defendant was advised of his Miranda rights before making the statement. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Petterway, supra; State v. Sonnier, 379 So.2d 1336 (La.1979). Finally, if the defendant alleges police misconduct in reference to the statement, it is incumbent upon the state to rebut these allegations specifically. State v. Petterway, supra; State v. Dison, 396 So.2d 1254 (La. 1981); State v. Franklin, 381 So.2d 826 (La. 1980).
Although the state put on no evidence at the hearing on the motion to suppress, we look to the totality of the evidence produced both at that hearing and at trial when we assess whether the state has carried its burden. We therefore include in our evaluation the trial testimony of Detective Martin Venezia, the tape recorded statements themselves[5] and other evidence introduced at trial. Concerning the giving of the Miranda rights prior to taking the statement, Detective Venezia testified that he read the rights to defendant and that he explained these rights because he knew that defendant could not read or write. In this regard, the state introduced a rights of arrestee form on which these rights are printed. This form is dated August 9, 1977, and in the taped statement of that date defendant acknowledges that the rights have been explained to him and that the signature on the bottom of the form is his. On that date at the beginning of the statement, defendant was asked what the Miranda rights mean and he responded "that I volunteer to tell the truth."
Regarding defendant's allegations of police misconduct, this charge is negated by defendant's own words on the tapes. On the July 31 tape defendant was asked by the interrogating officers whether any officer had struck him and he replied: "No, sir, none at all." He also was asked whether he had been coerced or threatened and replied negatively. He responded in the affirmative when asked if he had been allowed to use the bathroom and have water when needed. The August 9 tape concludes with defendant being asked if he had been *1308 threatened. Defendant said: "No one laid a hand on medidn't threaten me or nothing." We believe that defendant's own words sufficiently rebut his allegations that he was beaten. Although defendant asserted at the hearing on the motion to suppress that he was sobbing during the interrogation, the recording convinces us that this is not so.
Defendant's most serious argument that the statements should not have been admitted into evidence is that his mental condition was such that it was impossible for him to give a voluntary statement. Defendant contends that his situation was even worse than that of the defendant in State v. Glover, 343 So.2d 118 (La.1979), in which the Court held that Glover's statements were inadmissible because his mental condition was so poor that it was not possible for him to give a voluntary statement.
It is true that both this defendant and Glover were diagnosed as having serious mental illness, paranoid schizophrenia. However, the defendant before us, unlike Glover, was, by the testimony of his own witness at the hearing on the motion to suppress, in remission at the time he gave the challenged statements. Dr. Ritter based his conclusion that defendant was in remission, upon his assessment of defendant's answers to the questions asked by the police. Dr. Ritter cited the clarity of the answers, the lack of rambling and the apparent spontaneity of the answers. We notice the same characteristics of the answers when we listen to the tapes.
Glover suffered from organic brain damage according to the psychiatrists who examined him. There is no evidence that this defendant is similarly affected. This defendant, like Glover, received prolixin, a very potent anti-psychotic drug, intramuscularly. However, when defendant was returned to the parish prison from East Louisiana State Hospital, he refused to take prolixin by injection and another drug was substituted for it. Glover had to be continued on prolixin.
Finally, Dr. Ritter testified that the I.Q. score taken after defendant showed signs of schizophrenia was not necessarily accurate. He testified that the I.Q. score could be as much as 10 points higher when the schizophrenic is in remission. Defendant's I.Q. test was administered when he was hospitalized for schizophrenia in 1971 (six years before the statements were made) and the score was then 58. Dr. Ritter classified 58 as moderately retarded and stated that an I.Q. of 65 would be considered borderline. Taken together, the testimony that defendant was in remission at the time he gave the statements, and the fact that his I.Q. probably made him a borderline mental retardate at the worst, satisfies us that defendant's retardation was not of such a degree to make it impossible for him to give a voluntary statement.
Likewise, we do not believe that defendant's schizophrenia renders his statements inadmissible. His own witness testified that he was in remission at the time he gave the statements. Despite repeated questioning by defense counsel, Dr. Ritter would not say that the statements were involuntary.
The trial judge's ruling admitting the statements into evidence was not erroneous. This assignment lacks merit.
Defendant's last assignment of error is that under our system by which he is required to plead both "not guilty and not guilty by reason of insanity" he is denied the opportunity to have the jury consider each such defense unaffected by the knowledge of his having taken these possibly alternative positions. He contends that arguing both pleas to the same jury violates his right to due process because in pleading "not guilty by reason of insanity" a defendant is essentially admitting having committed the criminal act but is denying criminal culpability because of his diminished appreciation of right and wrong, whereas a guilty plea denies commission of the crime. Concerned with the disadvantage of taking alternative, *1309 contradictory positions, defense counsel says that he abandoned a viable insanity defense after opening argument and before closure of the case (by opting not to present insanity evidence) because he felt that the state had not produced sufficient evidence to prove that defendant committed any criminal act. Counsel cites no cases or specific authorities in support of his position.
In the instant case, defendant admitted that he was present when the armed robbery and murder took place. He argues, however, that his mere presence did not make him a principal to McDonald's acts. His insanity plea asks the jury, if it rejects this argument, to find that he could not distinguish right from wrong and therefore could not be responsible for what happened. Defendant's argument would be more persuasive, although not necessarily meritorious, if he were contending that he was not present at the commission of the crime. In that situation, a not guilty plea based upon an alibi defense and a plea of not guilty by reason of insanity would present clearly inconsistent although alternative defenses.
Whatever the plausibility of defendant's theoretical argument, it is not persuasive in this case. There is no merit to defendant's third assignment of error.

DECREE
For the foregoing reasons, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[*] Judges O. E. Price and Fred W. Jones, Jr. of the Court of Appeal, Second Circuit, and Judge John C. Boutall of the Court of Appeal, Fourth Circuit, participated in this decision as associate justices ad hoc, joined by Associate Justices Pascal F. Calogero, Jr., Walter F. Marcus, Jr., James L. Dennis and Jack C. Watson.
[1] This Court has already affirmed McDonald's conviction for first degree murder. 387 So.2d 1116 (La.1980). Pursuant to the jury recommendation, McDonald received a life sentence without benefit of parole, probation or suspension.
[2] La.R.S. 14:30.1 as it stood in July, 1977 when this crime was committed.
[3] Several state witnesses related events which coincide with the later admissions of defendant. Residents living across the street from the scene of the murder told of seeing two cars parked there. One witness said that the second car, a Cutlass, drove off, returned to the first car, a Vega, and that shots were fired from the Cutlass into the Vega. A neighbor of the victim related having found scattered papers belonging to the victim across the street from the victim's house. Defendant's fingerprints were found on one of these papers and on the Vega.
[4] As a result of an examination and hearing held earlier in January, 1978, defendant had been found incapable of assisting in his defense and had been committed to East Louisiana State Hospital. At a later hearing, in January, 1979, following a second examination, defendant had been declared competent to stand trial. Both earlier hearings had taken place before the motion to suppress hearing. Dr. Ritter had been a member of both commissions.
[5] We have been supplied with and have listened to the recordings of defendant's statements.