706 So.2d 563 (1998)
STATE of Louisiana, Appellee,
v.
Gary BARBER, Appellant.
No. 30,019-KA.
Court of Appeal of Louisiana, Second Circuit.
January 21, 1998.
*565 Louisiana Appellate Project by J. Wilson Rambo, Monroe, for Appellant.
Richard Ieyoub, Attorney General, Don Burkett, District Attorney, Clifford R. Strider, III, Assistant District Attorney, for Appellee.
Before STEWART, GASKINS and CARAWAY, JJ.
STEWART, Judge.
This criminal appeal arises from the 11th Judicial District Court, Parish of DeSoto, the Honorable Elizabeth A. Pickett presiding. After a jury trial, the defendant, Gary Barber, was convicted of first degree murder, a violation of La. R.S. 14:30. The jury unanimously agreed that a life sentence, rather than the death penalty, was the appropriate punishment, and accordingly the court sentenced the defendant to serve life imprisonment without benefit of probation, parole or suspension of sentence. From this conviction and sentence, the defendant now appeals. For the following reasons, we affirm both the conviction and sentence.

FACTS

A. BACKGROUND
Jeffrey Scott Rodgers was brutally murdered in September, 1994. Jeffrey, a mentally handicapped 27 year-old, lived in Shreveport with his parents in a subdivision off Pines Road. Jeffrey, who functioned at the intellectual level of an 8 or 9 year-old child, completed special education classes at Southwood High School and had been employed for five years as a busboy at Crescent Landing restaurant. He was described as friendly, generous and extraordinarily forgiving. Jeffrey seemed eager to make friends, tried to appear normal and avoided conflict of any kind. Particularly, Jeffrey would not defend himself if attacked. Jeffrey's mother handled his financial affairs, cashing his paycheck every two weeks and giving him a few dollars as needed because Jeffrey had a poor understanding of money.
Stacey Williams and Gary Barber, both 18 years old, were charged with first degree murder for the homicide of Jeffrey Rodgers. Stacey Williams, who lived with his parents in a trailer on Richardson Road in Stonewall, had completed the special education curricula at North DeSoto High School not long before this crime occurred. Unemployed at the time of the murder, Williams had hoped to enter the Army after high school but failed the Army entrance exam. Admitting drinking heavily and becoming violent when he got drunk, Williams had a recent conviction for simple battery.
Although he lived in Shreveport with his brother and his family in the Huntington Park Apartments located a few blocks from the Rodgers' home, Barber grew up living with his parents on Stonewall-Preston Road in Stonewall and attended North DeSoto High School as did Williams. However, Barber and Williams were at best acquaintances, not friends. Barber claimed to have been friends with Jeffrey Rodgers. The testimony *566 of Keith Campbell, Circle K employee, and Jamie Weaver, a friend of the defendant's, established that two were seen together at various times. At the time of the murder, Barber earned money by doing various chores and home repairs for a Shreveport woman, Mildred Blanc. Barber was placed on probation after being convicted of aggravated assault in March, 1994. In an ironic twist, Barber was scheduled to appear at a probation revocation hearing on October 6, 1994.

B. THE CRIME AND THE INVESTIGATION.
On Friday, September 23, 1994, Vickie Halverson, the manager of Crescent Landing restaurant, gave Jeffrey his paycheck for $173.12. At 10:30 p.m., Jeffrey got a ride home with his longtime friend and fellow busboy, Brett Rogers. When Jeffrey arrived home, his parents, Loretta and George Rodgers, were already in bed. Jeffrey came inside the house and asked his mother for money. She slid $2.00 under her bedroom door without seeing Jeffrey. Jeffrey went into his bedroom and then left the house without his parents seeing him.
Often after leaving work, Jeffrey changed out of his work uniform and went to the Circle K convenience store, a block away from the Rodgers' home, to "hang out" and meet people. Mrs. Rodgers assumed that this was what Jeffrey was doing that night.
At 10:30 p.m., Gary Barber left Mildred Blanc's house in his gray 1987 Honda. Between 10:30 and 11:00 p.m., the Rodgers' next-door neighbors (the Sanchez family) drove into their driveway and saw a gray Honda parked parallel to the curb in front of the victim's house. They saw Jeffrey talking to the occupant of the vehicle. Gary Barber testified that he picked Jeffrey up at the neighborhood Circle K and drove him to his house so Jeffrey could change out of his work uniform.
Although she never left her bedroom or saw defendant's car, Mrs. Rodgers heard Jeffrey briefly come back into their house not long after he had left the first time and then heard him leave again. Barber testified that he took Jeffrey back home so he could get his ID because he needed it at the liquor store.
Sometime before midnight, Barber and Jeffrey went into the Thrifty Liquor store at Bert Kouns and Walker Road. Pamela Brenner, the clerk on duty, checked Jeffrey's Louisiana ID card and then cashed his paycheck. Immediately thereafter, Jeffrey came back into the store and bought a fifth of whiskey. The clerk remembered Rodgers because he appeared handicapped and unsure of what he wanted. Barber testified that, after Jeffrey bought the whiskey, they left Thrifty Liquor and drove south on Highway 171 (Mansfield Road) where they stopped at another liquor store and at a gas station, purchasing more alcohol and some ice.
Then, Barber and the victim drove in Barber's car to "Pond Road" near Stonewall. Pond Road, an isolated spot in DeSoto Parish off of Wright Road, is near Stacey Williams' home on Richardson Road. Pond Road was an area where local youth gathered to talk, to drink and occasionally to fight. Barber said that he and Rodgers had been there together five or six times. Stacey Williams testified that he had only seen them once before.
Around midnight, Stacey Williams, his older brother Bobby, and another young man from Stonewall, James "Bugger" Evans, drove out to Pond Road, possibly to fight some other youths who had threatened Evans. Barber and the victim were still there. After a brief visit, Bobby Williams and James Evans left, but Stacey Williams stayed behind with his father's brownish-red truck and 3-wheel ATV. Another Stonewall youth, Don Wayne Berry, Jr., went to Pond Road at about 1 a.m. and saw Barber, Stacey Williams and the victim. Berry left a few minutes later to spend the night with Evans at his home. Evans' mother Rebecca testified that neither Evans or Berry left at any time during the night. Bobby Williams went home. His wife Jennifer testified that he did not go back out that night.
At 2:13 a.m., DeSoto Parish Deputy Sheriff Raymond Burr received an excessive noise complaint regarding an ATV at Pond Road. Arriving a few minutes later, Deputy Burr, *567 who knew Stacey Williams, told Williams, Barber and Jeffrey to go home. The deputy remembered seeing a gray car (Barber's) and a red truck (Williams'). Deputy Burr said that Jeffrey Rodgers did not request any assistance.
Barber, Williams and the victim then went to Williams' trailer home. They were alone at the trailer as Williams' parents were out of town. Shortly after 3:00 a.m., Stacey Williams telephoned Candice Berry, Don Wayne Berry's 16-year-old sister, who spoke briefly to Williams, Barber and the victim. When she spoke to Jeffrey, she said "Hi, I'm Candice," and Rodgers said "Hi, I'm Jeff." She told Jeffrey that she was going to sleep, and he said "Okay." She testified that the victim did not seem to be in any distress.
At about 3:10 a.m., Jeffrey called his parents at their home. The Rodgers testified that Jeffrey said that he had been beaten, was scared and wanted to come home. He told his mother that he was with his friend Gary Barber and that they were supposed to have gone to a football game. Mrs. Rodgers testified that she had never heard Barber's name before. Mr. Rodgers testified that Jeffrey told him he was with Gary Barber in Stonewall. The Rodgers kept Jeffrey on the phone for an hour and ten minutes. Jeffrey did not know exactly where he was but was able to read his parents the name and address from a phone bill in the Williams' trailer.
At 3:30 a.m., George Rodgers gave his son Phillip a cellular phone and sent him to Stonewall to look for the trailer. At 4:20 a.m., Jeffrey told his father that he heard someone at the door. He put the phone down and shortly thereafter, the connection was broken. Phillip Rodgers was not able to find the Williams' trailer.
About 5:00 a.m., the Rodgers called 911. Operator Vickie Paige took their call. She testified that the Rodgers spoke in excited tones concerning their fear that Jeffrey was missing but that they did not tell her that they knew that Jeffrey was injured. However, she also said that she did not ask them that question.
Approximately 5:30 a.m., Phillip Rodgers and DeSoto Parish Sheriff's Office Deputy J.R. Thomas found the Williams' trailer. Phillip testified that he saw a gray car and a red truck at the trailer. (The Williams' owned two trucks which looked red.) No one answered when the deputy knocked on the door, and Phillip Rodgers returned home.
Around 6:30 a.m., Charles Sersch, Jr., the Williams' next door neighbor, heard a truck door shut and looked out his bathroom window, partly because he knew that Stacey Williams was not supposed to be driving his dad's truck. Mr. Sersch said that it was just "breaking sun" when he saw Stacey Williams (who was armed with a shotgun) walking from his father's truck toward the Williams' trailer. As he watched, he saw Gary Barber get out of the passenger side of the truck and follow Stacey Williams to the trailer. Mr. Sersch testified that he had seen Barber "around the neighborhood you know here and there, maybe at a store or something, I have seen him before, though." At trial, he identified the defendant as the person he saw that night. Sersch was positive that the person he identified as Barber was not Stacey Williams' brother Bobby because he knew Bobby Williams well. At the time, Bobby Williams had long hair and a beard.
Later that morning, Deputies Larry Boyd and Bobby Simone went to the Williams' trailer. After speaking with Mr. Sersch's wife Brenda and Stacey Williams' younger brother James, who was staying with the Sersch's while Mr. and Mrs. Williams were gone, the deputies found Stacey Williams and Gary Barber asleep in the Williams' trailer. The deputies spoke to Williams, who denied either knowing or having seen the victim. The deputies did not wake Gary Barber.
About 10:00 a.m., Loretta Rodgers called Phillip Rodgers at work and told him that Jeffrey was still missing. Phillip returned to the Williams' trailer. This time, Stacey Williams answered the door, but Phillip did not see Jeffrey or Gary Barber there. James Williams, who was still at the Sersch's trailer, testified that he may have seen Gary Barber and Stacey Williams leave the Williams' trailer together in Gary's car around noon.
*568 Around 3:00 p.m., Shreveport Police Department (SPD) Officer Calvin Abram received a call reporting that Jeffrey Rodgers was missing and directing him to Gary Barber's apartment. Officer Abram knew Jeffrey from seeing him at the Circle K. Officer Abram went to the apartment complex and saw the defendant standing on his balcony. The officer testified that the defendant told him that he had not seen the victim in a couple of weeks.
Around 4:00 p.m., Phillip Rodgers and his brother Chris went to Gary Barber's apartment. Chris and Phillip spoke with Gary and his brother David. Gary told the Rodgers brothers that he had been with Jeffrey the night before but had dropped him off at a Charter convenience store on Mansfield Road around 1:30 a.m. Gary agreed to speak with Mr. and Mrs. Rodgers and told them that he left the victim at a Charter Station on Mansfield at 1:30 a.m. When Mr. Rodgers told the defendant that Jeffrey had called from Williams' trailer at 3:00 a.m., Gary suggested that Jeffrey may have walked through the woods and returned to the trailer. This suggestion caused the Rodgers to become suspicious of the defendant's story (and angry) because the convenience store in question is far from the Williams' trailer and, in Phillip's words, Jeffrey was "just scared to go by hisself somewhere like that."
Then, Barber told the Rodgers that he may have been mistaken about the exact time that he left Jeffrey at the store. He said that he actually dropped Jeffrey off around 3:00 a.m, and that he (Barber) went inside the Charter store, bought a Coke and "talked to the woman inside." Michael Arnold, the manager of the Charter store in question, contradicted Barber's story when he testified that he knew the victim because they attended Southwood High School together and that the victim never came into the store that night. Mr. Arnold also said that he was the only person operating the register that night and that the only woman in the store at the time in question was the shift manager who was in an office and was never behind the counter.
Later that afternoon, Bobby Williams saw his brother Stacey again. Stacey was test driving a new truck and had bought several presents for his family, including a meat rack for the ATV and bathing suits for Bobby's daughter.
Approximately 7:30 p.m., Mrs. Rodgers called the Shreveport Police Department to report Jeffrey missing. Ms. Judy Hall, an SPD complaint taker, received the call and testified that Mrs. Rodgers was frightened for Jeffrey's welfare but did not tell her that Jeffrey said that he had been beaten or injured.
The Rodgers and many residents of the Stonewall area spent Saturday night and most of the day Sunday searching for Jeffrey in the Stonewall area. On Sunday morning, one of the Rodgers' former neighbors and a former Caddo Deputy Sheriff, Dennis Berry, found Jeffrey Rodgers' Louisiana ID card under the wooden bridge on Missile Base Road (which turns into the Keithville-Kingston Road) in Stonewall. A Stonewall youth, Ryan Greco, found Jeffrey's body floating in a pond close to Middleton Road in Stonewall. This pond, called the "Dew Pond," is located 1.4 miles from the house where Gary Barber grew up. The defendant said that he had been to the pond two or three times. James Wyatt and Blake Spillman, two young men who were friends of the defendant when he lived in Stonewall, testified that they had camped and fished with Gary at the pond.
In the early afternoon, Deputy Simone visited the Williams' trailer to retrieve Jeffrey's ID card from Dennis Berry when he learned that the victim had been present at the trailer the night he disappeared. Both Williams and Barber admitted to Deputy Simone that they had been with the victim but that Barber had left the victim at the Charter station. Because Stacey Williams had previously told him that the victim had not been to the trailer at all, Deputy Simone placed Barber under arrest for criminal mischief, mistakenly believing that Barber was Williams. As Barber stood next to the police car, Charles Sersch identified Barber to the deputy as the person he had seen with Williams at 6:30 a.m. Saturday morning. Sersch said that, when he identified Barber, he was not handcuffed *569 but was kneeling down talking to a child.
When Deputy Simone learned that he had arrested the wrong person, he placed Stacey Williams under arrest, informed him of the Miranda rights and placed him in the back of the patrol car. Stacey's father then showed the deputy what appeared to be bloodstains in the bed of the Williams' Ford truck. The deputy then called for a supervisor and an investigator. Shortly thereafter, Stacey Williams shouted "We did it, we did it, we beat him up and threw him in a pond."
After Williams' statement, the deputy activated the DWI video camera in his car to tape any other statements by Williams. Because the camera faces forward looking out of the patrol car's windshield, Williams was not videotaped, but the camera picked up audio from inside the car. About this time, Stacey Williams' father became extremely upset, screamed at either Barber or Williams or both, and was restrained by the deputy until he calmed down. Williams subsequently made a statement to the deputy admitting that he and Barber had beaten and killed the victim and giving the location of the body. A few minutes after Williams made this statement, the videotape showed the deputy dropping Jeffrey Rodgers' ID card on the ground while examining it. Police did not attempt to take prints from the card because the card was handled extensively after initial recovery.
After securing the crime scene around the Dew Pond, Deputy Andy Anderson photographed the scene. During his investigation, Deputy Anderson discovered several pieces of physical evidence. He found blood stains approximately 30 to 40 feet from the edge of the water and what appeared to be drag marks leading from the blood to the water. Ralph Penuell, from the DeSoto Coroner's Office, testified that, when he recovered the body from the pond, he also saw what looked like struggle or slip marks and drag marks from the blood to the pond.
Deputy Anderson said that the trail from the road to the pond was mostly dry sand or clay. The deputy said that his "gut feeling," judging from the scuff marks and way that the ground was "ruffled," was that three people had walked down this trail. The only identifiable footprint in this area belonged to the victim. A boot print of some kind was also found. DeSoto reserve deputy Don Pierce helped Deputy Anderson secure the crime scene and testified that he saw footprints on the edge of the pond and on the pond bottom.
Detective Robert "Robo" Davidson was in charge of the investigation. Detective Davidson seized a number of pieces of physical evidence pertinent to the crime, including the vehicles driven by Williams and Barber, Williams' shotgun and bloodstained boots and blood from the crime scene. Notably, the detective found bloodstains on the wooden bridge on the Missile Base Road.
Davidson was the only officer who took any kind of statement from the defendant. The defendant told Davidson that he left Jeffrey at the Charter station, returned to the Williams' house and went to sleep. The defendant emphatically denied killing the victim.
Various suspected blood stains were recovered from the seized vehicles and the crime scenes. Dawn Tingle, the serology expert, analyzed these stains. Blood was found on a number of items connected to Williams, including the truck bed, the shotgun barrel and his left boot. The blood on the boot was of the same type as the victim's blood. Blood in the form of transfer stains was found inside the cab of Williams' truck on both the driver and passenger sides. The defendant's car had a number of stains which were probably blood. The victim's blood was on a shirt in the defendant's car. Suspected blood was also found on a pair of blue jeans seized from Barber's apartment but the origin of this blood was not established. Blood of the victim's type was found in pine straw at the Dew Pond.
Crime lab technician Michael Stelly found the victim's fingerprints on the bag from the liquor store. However, none of the prints lifted from Williams' truck could be matched to anyone, including Williams, possibly because it had been washed.
Brenda Reames, the forensic pathologist, testified that the victim's injuries from the *570 beating were quite severe, and might well have caused the victim's death independently if he had not drowned. She testified that because of the vicious beating, the victim was probably unconscious before he drowned and that, in that condition, he would not have been moving around. The doctor found no significant debris in the victim's lungs. The absence of debris would not be consistent with the victim being held in the mud face down but would be consistent if the victim's head was sideways when held underwater. Another injury, to the victim's hyoid bone (in his neck), could have resulted from his neck being placed on an object as his head was held down. In one of his pre-trial statements, Williams said that Barber held his foot on Jeffrey's head as the victim's neck rested on a root from a log in the pond. The doctor said that the extensive injury to the victim went beyond the ordinary beating of a robbery victim and was consistent with a high level of energy or emotion on the part of the attacker.
Dr. Charles Odom, the defense expert forensic pathologist, reviewed Dr. Brenda Reames reports and agreed with her conclusion that the victim was probably unconscious and immobile before he drowned. Dr. Odom testified that Stacey Williams' right boot appeared to have been partly immersed in water after it came in contact with the victim's blood. Dr. Odom also said that he would have expected to see more debris in the victim's lungs if the victim had been drowned by pushing his face into the mud. The doctor testified that the injuries to the victim reflected a great deal of anger, violence and "overkill" consistent with a "gay bashing" attack.

C. STACEY WILLIAMS VS. GARY BARBER.
As a result of Williams' statement when he was arrested for criminal mischief, he and Barber were arrested for first degree murder. Williams gave three statements to Detective Davidson which were taped and transcribed for the record. In these statements, Williams incriminated himself and Barber in the robbery and murder of Jeffrey Rodgers. At trial, each man gave opposing versions of the events of the early morning of September 24, 1994.
Both Williams and Barber agreed that the attack on Jeffrey began after Barber had an accident on the ATV at the Pond Road. Williams said that Barber hit Jeffrey when Jeffrey laughed at him for wrecking the ATV, that Jeffrey stopped laughing after Barber hit him, and that Deputy Burr did not notice that Jeffrey had been hit. Gary Barber said that he and Jeff were both laughing about this accident when Stacey Williams hit Jeffrey, perhaps because he was angry at the damage to the ATV. Barber said that Williams apologized to Jeffrey just before Deputy Burr arrived and told them to leave.
Notably, Williams admitted that he and his brother had consumed "about two cases of Budweiser" that Friday. Barber also admitted that he was drunk when the three were at the pond road.
Williams and Barber agreed that the three went back to the Williams' trailer after the deputy told them to leave the Pond Road. Barber said that Williams had told him that he could spend the night there because he (Barber) was too drunk to drive home.
Williams testified that he and Barber decided to go to Shreveport. However, Williams said that Barber didn't want Jeffrey to come with them and that Barber began arguing with Jeffrey. When Barber and the victim could not agree, Williams said that everyone went back into the trailer and that he then went back outside. He said that for the hour he remained outside repairing the damaged ATV, Barber sat in his car listening to the radio. According to Williams, this was when the victim called his parents.
Williams said that after he fixed the ATV, he and Barber decided to try to distract Jeff by calling Candice Berry and sneaking away while Jeffrey was on the phone. However, since Miss Berry did not talk at length, this ploy failed. Jeffrey wanted to come with Barber and Williams. Williams testified that as he and Barber tried to sneak away from the victim, Jeffrey followed them outside the trailer. Williams said that he and Barber began to beat him with fists and 2 × 4's to *571 stop him from coming with them. Jeffrey did not fight back at all.
Williams said that after he and Barber beat Jeffrey in the Williams' yard, Barber decided to put Jeff in the truck bed and let him come along with them. Williams said that Barber told him to go out "the back way" on Missile Base Road. Williams testified that he got his shotgun in order to shoot snakes under a bridge on that road. He said that he "always" did this but that he had never before done it at night.
Williams testified that he drove the truck to the second bridge on the Missile Base Road, stopped and fired his shotgun into the creek. Williams said that, when he got back, Barber and the victim were arguing and that Barber had taken Jeffrey's money and ID from Jeffrey's pants pocket. Williams said that he took Jeffrey's ID from Barber but did not remember what he had done with it. Williams and Barber got back in the cab of the truck, Jeffrey got back in the bed, and Barber gave Williams some money. Barber then directed Williams to drive to the Dew Pond, where Williams said he had never before been. After stopping beside the pond, Williams (armed with the shotgun) and the victim followed Barber back to the pond and, when the trail widened, Williams and Barber began beating Jeffrey. Williams hit him with the barrel of the shotgun while Barber used a stick and his fists and eventually the barrel of the shotgun when his stick broke. After a while, Williams said that he turned away to leave but noticed that Barber wasn't following. Williams turned around and saw Barber standing over Jeffrey at the edge of the pond. He said that Jeffrey was laying on his stomach and Barber had his foot on Jeffrey's head or neck, holding Jeffrey's head under the water. Williams said that he "just froze" and watched Barber. When Barber eventually stopped and left, Williams followed him back to the truck. Williams claimed that, when they left, Jeffrey was "still moving like he was trying to get up."
Williams testified that he got his gun, drove himself and Barber back to his trailer and put his and Barber's clothes in the washer. He did not put any soap in the washer. He and Barber took showers, put their clothes in the dryer and went to sleep. Williams said that he remembered deputies waking him up and questioning him about Jeffrey and that he told them that he didn't know who they were talking about. Williams testified that Barber told him to tell the police that Gary had dropped Jeffrey off at the Charter station in the middle of the night. When Williams woke up again, Barber was still there. Williams testified that he went outside thinking that "Gary would leave when I started doing that and he just stayed around." He said that Barber was barefoot when he left the trailer and that he had his shoes in his hands. Williams testified that he then drove his dad's truck to a car wash on Mansfield Road, that Barber followed him there and that they both washed their vehicles and went their separate ways.
Barber's testimony was dramatically different from the testimony of Stacey Williams. Barber said that, as he was speaking to Miss Berry, he heard Williams' truck start and that he asked Miss Berry to speak to Jeffrey while he looked for Williams. Barber testified that he then left in his car and returned to Pond Road where Williams eventually appeared. He stated that Williams was not outside the trailer repairing the ATV at this time.
Barber denied that he met Williams at the car wash. Barber said that, when he and Williams got back from Pond Road, Williams went into the trailer and that "the next thing I know before I could get inside Jeff is flying out the door" and that Williams "jump[ed] on him." Barber said that the victim had blood on his face after this incident. Barber said that the victim told him that he wanted to go home but testified that he (Barber) still did not want to drive to Shreveport because he was too drunk. Barber said that he agreed to drive Jeffrey to the Charter station on Mansfield Road and leave Jeffrey there. He testified that Williams overheard this conversation.
Barber testified that he and Jeffrey got into his car and drove to the Charter station, where Jeffrey got out. He said that Williams was at the station when he and *572 Jeffrey arrived. Barber said that he went inside the store and got a coke and that a tall black woman came from the back of the store and sold him a Coke and some gas. Barber said that he then drove back to Williams' trailer and went to sleep. According to Barber, Williams was not in the trailer at this time.
Williams testified that the variations between his statements and his testimony (as well as the differences among his statements) should be attributed to his memory. He said "just bits and pieces I remember and then I forget."

DISCUSSION
Assignment of Error 1: The evidence herein is legally insufficient to sustain Mr. Barber's conviction for first degree murder.
The defendant urges on appeal that the evidence against him was insufficient to support his conviction for first degree murder, a violation of La. R.S. 14:30. That statute provides, in pertinent part:
A. First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnaping, second degree kidnaping, ... armed robbery, ... first degree robbery, or simple robbery.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La. 1992); State v. Bosley, 29,253 (La.App.2d Cir. 4/2/97), 691 So.2d 347.
Despite his numerous other motions, it does not appear that the defendant filed a motion for post-verdict judgment of acquittal. However, such a motion is not necessary in order for this court to review an assignment of error challenging the sufficiency of the evidence. State v. Green, 28,994 (La.App.2d Cir. 02/26/97), 691 So.2d 1273.
Under Jackson v. Virginia, supra, the proper standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bellamy, 599 So.2d 326 (La. App. 2d Cir.), writ denied, 605 So.2d 1089 (1992).
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Lott, 535 So.2d 963 (La.App. 2d Cir.1988).
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation underJackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 5(C); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra; State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (1987).
*573 In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Ford, 28,724 (La.App.2d Cir. 10/30/96), 682 So.2d 847.
The defendant argues that the jury could not have reasonably credited Stacey Williams' testimony because of its internal contradictions and conflicts with the physical evidence and, therefore, the state did not prove beyond a reasonable doubt that the defendant was the perpetrator of this crime. He also argues that the state failed to prove that the events as described by Williams amounted to first degree murder rather than second degree murder.
In the defendant's original brief, he cites the court to the testimony given at the hearing on the motion to fix bail and the alleged inconsistencies in Williams' statements.
The defendant's principal stated challenge, asserted in his supplemental brief, to Williams' version of events concerns physical evidence found on the Missile Base Road and the discrepancy between this location and Williams' testimony. As noted, there are two bridges on the Missile Base Road leading from the Williams' residence to Mansfield Road. The first, or eastern, bridge is a small wooden bridge and the second bridge is a concrete bridge with reflecting signs. This second bridge is on the dividing line between DeSoto and Caddo Parishes; photos of this bridge show bullet-ridden black and yellow reflecting signs. Williams told Investigator Davidson that he and Barber beat Jeffrey (and that Barber took Jeffrey's money) on the parish line bridge on Missile Base Road. He repeated this assertion at trial, saying that the beating happened on the second (western) bridge and emphatically denied that the events took place on the wooden bridge to the east. Investigator Davidson went to the scene and testified that the physical evidence (ID card and blood stains) was found on "a bridge I believe divides DeSoto and Caddo Parish." However, the detective described the bridge in question as "a small wooden bridge" and identified it as the bridge in the photos which were introduced into evidence. This appears to be the small wooden bridge to the east and not the western bridge that Williams' gave as the correct location.
This is a contradiction between the witness' story and the physical evidence, but the legal import of the contradiction is not great, and the discrepancy hardly amounts to reversible error. Williams admitted that he committed this crime and was involved in every one of the violent events which led to the victim's death. According to his own testimony, Williams was at the scene of this beating; therefore, an error as to the location of the attack is at most a mistake of memory or perception and not an "irreconcilable" conflict with the physical evidence. Although Williams said he was familiar with these bridges near his house, this assault happened after 4:00 a.m. on a dark road, and Williams admitted that he was intoxicated throughout most of the evening. He also said that he had never been to the bridge to shoot snakes at night before. Had Williams testified that nothing happened on this road, or that the attack happened on another road, the defendant's argument would be stronger. However, Williams' mistake regarding which bridge was the scene of the attack presents only a small conflict attributable to the circumstances of the scene and does not suggest that he was not a credible witness overall or was trying to "frame" the defendant for this crime.
There are other elements of Williams' statements and testimony which are, if not inconsistent, not entirely in harmony with each other. One of the most important is the location of the final attack on the victim and the unexplained drag marks at the Dew Pond. Williams told Investigator Davidson that this attack was right at the edge of the pond, yet there was evidence that the attack began at least 40 feet from the edge of the pond. Williams later explained that if he could see the water, he thought it was the edge of the pond. Other details which fit into this category include the status of the victim when Williams and Barber left him, the time that Williams worked on the ATV and the shoes that the defendant was wearing.
*574 Overall, Stacey Williams' testimony is less perfect than that might be hoped. However, the defects in the testimony are attributable to the witness' youth and limited ability to express himself and not to a lack of truthfulness. As noted, Stacey Williams was a special-ed student. Although he frequently omitted fine details from his testimony that keen cross-examination painted as errors or omissions, the state successfully rehabilitated Williams on these points. Williams also exhibited a tendency to be agreeable on the stand. While he never flatly contradicted himself between direct and cross-examination, the record indicates that both the prosecutor and the defense attorney were able to lead Williams more easily than an average witness.
In short, the problems with Williams' testimony are not of the irreconcilable sort which would merit reversal but instead are the result of the witness' limitations combined with the circumstances of the crime itself (including drunkenness, darkness and the time of the morning). There is nothing in this record which shows Williams' testimony to be unreliable to a degree warranting the reversal of a credibility call by the jury. The testimony of Mr. Sersch putting Barber with Williams at a time inconsistent with Barber's story but consistent with Williams' is further evidence that Williams' story was basically true. Cross-examination of Mr. Sersch was so extensive that the jury was aware of every possible flaw in his testimony. The critical testimony thus contains no problems sufficient to overturn the jury's decision to credit the state's witnesses over the defendant's.
Barber also makes a brief argument that the state failed to prove all the elements of first degree murder. Specifically, he argues that there was no evidence of a kidnaping or of a robbery in conjunction with the murder. There was arguably a kidnaping in this case, but there was certainly a robbery-murder. Williams testified that Barber reached into Jeffrey's pocket and took the victim's money just after Williams and Barber had beaten Jeffrey on the bridge. Williams said that he drove Barber and Rodgers to the Dew Pond where he and Barber beat the victim to death. The defendant urges that this taking was not sufficiently contemporaneous with the killing to make this a first-degree murder. This argument is flawed. The events between the robbery and the murder were one continuous chain of events. Further, Barber and Williams never left the victim after taking the money; they just took him to a place where killing him would be less public than in the middle of a road. See State v. West, 408 So.2d 1302, 1305 (La.1982).
Although not insubstantial, this assignment of error is without merit.
Assignment of Error 2: The trial court made impermissible comment upon the evidence while in the presence of the jury during the trial on the merits of this matter.
The defendant has expressly abandoned this assignment of error.
Assignment of Error 3: The trial court erred in denying certain pretrial motions filed on behalf of Mr. Barber in this proceeding.
Assignment of Error 4: Counsel for the State made impermissible reference to the defendant's failure to present evidence during the course of closing arguments in this proceeding.
Assignment of Error 5: The trial court erred in overruling defense counsel's objections and requests for mistrial prompted by improper comment and conduct by counsel for the State during the course of closing arguments herein.
These assignments of error have been neither briefed nor argued and should be considered abandoned. U.R.C.A. Rule 2-12.4.
Assignment of Error 6: The imposition of a sentence of life imprisonment under the facts and circumstances of this case constitutes cruel, unusual and excessive punishment.
The defendant complains that his sentence is excessive. As noted by the state, the record does not reflect that the defendant made or filed a motion to reconsider sentence. Therefore, the defendant is not entitled to review of his sentence on appeal. La.C.Cr.P. art. 881.1(D); State v. Jackson, 622 So.2d 1224 (La.App. 2d Cir.1993); State *575 v. Bryant, 607 So.2d 11 (La.App. 2d Cir. 1992), writ denied, 92-3082 (La.2/25/94), 632 So.2d 760.
Even if the defendant were entitled to review of the sentence, this court would certainly find the life-without-benefits term appropriate and not excessive. "Senseless" is insufficiently descriptive of this crime. From all accounts, the victim was a gentle and trusting person who would happily have shared his money with his companions, had they asked. Because of the victim's limited mental abilities and concomitant timidity, Jeffrey Rodgers was unable to escape from his tormentors and, indeed, did not even fight back as Barber and Williams beat him nearly to death in a vicious and subhuman manner and then drowned him. The jury demonstrated greater kindness and more humane restraint by recommending against Barber's execution.
This assignment of error is without merit.
Assignment of Error 7: The Trial Court abused its discretion by not granting an evidentiary hearing to determine whether the victim's mother contacted any person in the jury venire other than Bobbie Wiggins.
In this assignment of error, the defendant complains that the trial court impermissibly limited his ability to test the integrity of the jury venire after the court discovered that Mrs. Rodgers had either attempted to contact or actually contacted a potential juror, Bobbie Wiggins. This contention is well addressed by the state in its brief, and we agree with the conclusions therein.
Mrs. Rodgers (the victim's mother) used to work for AT & T in Shreveport but had been retired from that job for some time before this trial. While she worked there, she was acquainted with a black female named Bobbie Wiggins. Ms. Wiggins retired from AT & T in 1992. Ms. Wiggins lived in Mansfield at the time of the trial and was drawn as a member of the jury venire.
On August 26, 1996, the victim's family drove to Mansfield to attend a pre-trial hearing and went to the District Attorney's office. The Rodgers were mistaken about the date and did not need to be there. On their way out of the D.A.'s office, Mrs. Rodgers used the phone to call Ms. Wiggins. It is unknown if Mrs. Rodgers actually spoke to Ms. Wiggins. Mrs. Rodgers may have known that Ms. Wiggins was drawn as a member of the venire at the time she called because the venire list came out on July 23, 1996.
On September 15, 1996, the Rodgers met with the District Attorney to discuss voir dire. At that time, they told the prosecutor that they knew Ms. Wiggins and that she would be a good juror.
On September 17, 1996, during voir dire, the parties and the court questioned Ms. Wiggins about whether she knew the Rodgers family. The juror responded that she did not remember Mrs. Rodgers but might know her if she saw her. She also said she did not know anything about the Rodgers' children. The state then informed the court and the defendant that Mrs. Rodgers knew Ms. Wiggins and had said that "she would be a great juror and that she knew Jeffrey and that they were good friends." The court, on its own motion, excused Ms. Wiggins for cause. Thereafter, it came to light that Mrs. Rodgers had either talked to or attempted to talk to Ms. Wiggins in August.
The next day, defense counsel expressed his concern that the venire had been "compromised." Because of the improper contact, counsel made a motion for a mistrial and requested that the venire be quashed. In response, the prosecutor gave a detailed explanation of Mrs. Rodgers acquaintance with and attempt to contact Ms. Wiggins. The prosecutor told the court that the D.A.'s office had not provided the Rodgers with a list of the venire and that to his knowledge they had never seen a list of the venire.
Defense counsel then requested a hearing to determine the extent, if any, of any other contact between the victim's family and the members of the jury venire. In response, the court set forth its opinion about the behavior of the various persons involved in the incident, gave its belief that Ms. Wiggins was untruthful during voir dire and indicated that the suggestion that other jurors had been contacted was mere speculation. Citing the fact that Ms. Wiggins had been removed from the jury, the court denied the motion *576 for a mistrial. The court told defense counsel that he would have the opportunity to question the remaining potential jurors about the extent of their contact, if any, with the parties and then denied the request for a hearing. Defense counsel objected to the ruling on the motion for mistrial and request for a hearing.
Defendant applied to the supreme court for a supervisory writ. That court noted that the application should have been made to this court but nevertheless denied the writ. State v. Barber, 96-2310 (La.9/19/96), 679 So.2d 410.
On appeal, defendant contends that his constitutional rights to present a defense and to the assistance of counsel were impermissibly curtailed by the court's rulings because an evidentiary hearing could have "determined exactly how wide spread such conduct was with regard to the prospective jurors of the venire and the Court would have been in a position to exercise its discretion in making a sound decision to either grant or deny the motion for mistrial." In support of this argument, the defendant cites State v. Charles, 377 So.2d 344 (La.1979) and State v. McLemore, 26,106 (La.App.2d Cir. 06/24/94), 640 So.2d 847, writ denied 94-1908 (La.12/9/94), cert. denied 514 U.S. 1116, 115 S.Ct. 1974, 131 L.Ed.2d 863 (1995), for the proposition that communications or contact with a juror during a trial about the matter pending before the jury is presumptively prejudicial and at least ought to entitle the defendant to a hearing.
The state correctly notes that these cases concern actual contact with seated jurors during the trial. The contact (if any) in this case was made before trial with a potential juror who was excused because of the conduct in question. Thus, the presumption of prejudice does not apply.
La.C.Cr.P. art. 775(6) provides that the court may order a mistrial whenever false statements of a juror on voir dire prevent a fair trial. In this case, the juror's deception was discovered before trial began, and the trial court excused the juror from service on its own motion. Mistrial is a drastic remedy, and there is not even a suggestion in this case that any of the jurors who served on the panel knew the victim's family or had any contact with them. Clearly, no mistrial was warranted.
The hearing is a closer question, but we find that the ordinary process of voir dire was sufficiently curative of any problems which might arise in this area. Ms. Wiggins is the only potential juror with whom the issue of improper contact was raised, and she was excused. Defendant had a full opportunity to probe the jurors' knowledge of the victim and his family on voir dire. (Voir dire of the other jurors was not transcribed.) If another juror who knew or could have known the family appeared, or if there was some suggestion that contact had been made with a juror, further inquiry would have been warranted. Under these circumstances, where the victim's family admitted the single contact and that contact was immediately brought to light by the prosecutor, the defendant has shown insufficient prejudice to merit reversal or remand.
This assignment of error is without merit.
Assignment of Error 8: It was error on the part of the Trial Court to allow Mr. Don Burkett, District Attorney for the Eleventh Judicial District, to testify during the State's case on rebuttal, since the State was aware that Mr. Burkett was a potential witness and chose not to have him placed under the rule of sequestration.
This assignment of error pertains to the propriety of certain testimony given by the DeSoto Parish District Attorney, Don Burkett. Burkett's testimony pertained to three witnessesSarah Barber, James Kevin Wyatt and Blake Spillman. Witnesses in this trial were placed under the rule of sequestration. Don Burkett was present in the courtroom on many occasions while testimony was given. However, Ms. Barber, Wyatt and Spillman testified on October 5, 1996, and Mr. Burkett was not present in the courtroom on that date.
Sarah Barber was a defense witness. At the time of this crime, she was married to David Barber, the defendant's brother, and lived with him, their daughter Kristi and the defendant. By the time of the trial, she and *577 David were divorced. As noted above, Ms. Barber testified that she had dumped all of David's clothing into the front yard of one of Stacey Williams' relatives during a marital dispute sometime after October 1993. She also testified that she remembered the defendant returning to their apartment sometime on the morning of Saturday, September 24, 1994, and that the defendant was wearing shoes.
The next day, during rebuttal, the state called Don Burkett to testify. The court permitted the D.A. to testify over the objection of the defendant. Burkett testified that he had interviewed Ms. Barber on two occasions. On September 16, 1996, he traveled to Ringgold and spoke with her. He said that, during that interview, Ms. Barber told him that she did not remember anything about the defendant coming back to the apartment that day. Burkett testified that he spoke to Ms. Barber again on September 23, 1996, and that she told him then that she remembered Barber returning to the apartment on September 25, 1994.
Wyatt and Spillman testified that during 1992 and 1993, they spent time camping, fishing and riding ATV's with the defendant at the pond where the victim's body was found. On cross-examination, defense counsel tried to impeach the witnesses with evidence that they were enemies of the defendant because of an incident over a girl. He also tried to show that they had gotten together with the D.A.'s investigator and "figured out" their story. Burkett testified that he had separately spoken with Wyatt and Spillman and had instructed them to tell the truth and not to discuss the case with each other or with anyone besides the D.A.'s office. Defense counsel cross-examined Burkett regarding his knowledge of and involvement with the witnesses whose testimony he had referenced.
On appeal, the defendant argues that the trial court should not have permitted Burkett to testify because he was not sequestered through the entire trial and that his testimony did not fit one of the exceptions to La. C.E. art. 615 governing sequestration. The state argues that the error, if any, was harmless because the witness was not present during the testimony of any of the witnesses in question.
As the parties note, State v. Wilson, 602 So.2d 779 (La.App. 2d Cir.1992) contains a similar, but not identical, issue. In Wilson, the trial court permitted an assistant district attorney to testify, over the defendant's objection, in rebuttal to a witness who had previously given that ADA a different version of events than the witness related at trial. The ADA was not the prosecutor in the case at bar. This court held that the situation presented no error because (1) the ADA was not the prosecutor and did not have a "dual role" in the case and (2) the need for the ADA's testimony was not apparent until the witness changed his story at trial.
The Wilson case stands for the proposition that a prosecutor, particularly one not involved in the case at bar, may be a competent witness. In that regard, the defendant's arguments that Burkett should not have been a witness are without merit. Certainly, he did not have a dual role as prosecutor and witness in this case. It is arguable that the need for his testimony became apparent only after the witnesses testified. This appears clearly to be true of Wyatt and Spillman but less so with Ms. Barber, who changed her story on September 23, 1996 (as trial began). Of course, the prosecutors did not know what Ms. Barber was going to testify to until they heard her on the stand.
Although Burkett was a competent witness, there remains the matter of the violation of the rule of sequestration. That rule is set forth in La. C.E. art. 615:
A. As a matter of right; exceptions. On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interests of justice, the court may exempt any witness from its order of exclusion. However, this Article does not authorize exclusion of:
(1) A party who is a natural person;

*578 (2) A single officer or single employee of a party which is not a natural person designated as its representative or case agent by its attorney;
(3) A person whose presence is shown by a party to be essential to the presentation of his cause such as an expert; or
(4) The victim of the offense, upon motion of the prosecution; however, if a victim is to be exempted from the exclusion order, the court shall require that the victim give his testimony before the exemption is effective and the court shall at that time prohibit the prosecution from recalling the victim as a witness in the state's prosecution in chief and in rebuttal. The court shall also enter such other order as may appear reasonably necessary to preserve decorum and insure a fair trial, provided that the victim shall not be allowed to sit at the counsel table.
B. Violation of exclusion order. A court may impose appropriate sanctions for violations of its exclusion order including contempt, appropriate instructions to the jury, or when such sanctions are insufficient, disqualification of the witness.
The "exceptions" to the rule of sequestration, as the defendant calls them, are not really exceptions at all. These are persons whom the court may not exclude. Burkett was not a party to the proceedings, was not designated a case agent (although he perhaps functioned in that role) and was not shown to be essential to the presentation of the cause. However, La. C.E. 615(A) allows the court to exempt any witness from the order in the interests of justice.
The purpose of sequestration is to assure that a witness testifies as to his own knowledge, to prevent witnesses from being influenced by the testimony of others, and to strengthen the role of cross-examination in developing facts. In examining sequestration violations, the reviewing court considers the facts of each case to determine whether or not prejudice resulted. Further, a violation of the sequestration order does not warrant a mistrial absent an indication that the infraction materially prejudiced the defendant. State v. Hopkins, 626 So.2d 820, 823 (La.App. 2d Cir.1993).
The matters to which Mr. Burkett testified were conversations between himself and the witnesses. This sort of testimony, relevant to credibility, involves only the person testifying (Mr. Burkett) and the witness being impeached; it does not depend on the veracity of third persons and thus carries little possibility of contamination by hearsay. Because Burkett did not hear the witnesses testify the previous day, his testimony was given from his own knowledge of the relevant events and the defendant has not shown that his testimony was influenced by the testimony of others. Likewise, because his testimony concerned one-on-one conversations with the earlier witnesses whom Burkett did not hear testify, there was no impairment of the defendant's right to cross-examine Burkett about his memory of the events.
Thus, even if Burkett's testimony was a violation of the rule of sequestration, the defendant suffered no prejudice therefrom.
This assignment of error is without merit.

CONCLUSION
For the reasons given above, we affirm defendant's conviction and sentence.
AFFIRMED.