LOLLEY, J.
1,Larry Richard Brown (“Brown”) was convicted by the Sixth Judicial District Court, Parish of East Carroll, State of Louisiana, of one count of second degree murder, in violation of La. R.S. 14:30.1, and was sentenced to life in prison at hard labor without the benefit of parole, probation, or suspension of sentence. Brown now appeals. We affirm his conviction and sentence.
FACTS
On the night of November 12, 2008, Gerald King (“King”) was shot and killed while sitting in his car outside Uncle Darrell’s Mini Market (“Uncle Darrell’s”) in East Carroll Parish. Several people standing nearby witnessed the murder and stated that the defendant, Brown, walked up to the driver’s side window of the vehicle where King sat and fired a small black revolver into the vehicle several times. Police arrested Brown at his aunt’s house without incident the following day.
Brown was charged by bill of indictment with one count of second degree murder. Subsequently, Brown filed notice that he intended to produce evidence suggesting that others had a motive to kill King. The trial court ruled that such evidence would not be admissible unless the defendant was able to establish a sufficient foundation for the admission of character evidence during trial.
Brown later filed a motion to recuse Judge Crigler claiming that Judge Crigler would be unable to remain impartial because the victim’s mother had volunteered to assist with the judge’s election campaign. After a hearing, the motion to recuse was denied.
Injury selection began on October 11, 2010. During voir dire, 14 of Brown’s challenges for cause were denied, and Brown used all of his peremptory challenges before the jury was seated. On October 12, 2010, Brown filed a motion for change of venue arguing that the responses given by potential jurors during voir dire indicated that the level of pretrial publicity would deny him a fair and impartial jury. After a hearing, the trial court denied Brown’s motion for change of venue.
The jury trial began on October 13, 2010, and lasted two days. On October 15, 2010, the jury returned from deliberation *730 with a verdict of guilty of second degree murder. Brown waived sentencing delay, and the trial court sentenced him to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. This appeal followed.
DISCUSSION

Sufficiency of the Evidence

Brown argues that the evidence adduced at trial was not sufficient to support a conviction of second degree murder. Specifically, Brown argues that the evidence was insufficient because: (1) the testimony from witnesses present at the scene of the shooting was rife with inconsistency; (2) many of the witnesses were under the influence of drugs or alcohol; (8) the key witness did not tell the same story more than once; and, (4) the witnesses contradicted each other on the issue of whether Brown was indeed the shooter. We disagree.
^Louisiana R.S. 14:30.1 states in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.05/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder. State v. Pigford, 2005-0477 (La.02/22/06), 922 So.2d 517. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness. State v. Casey, 1999-0023 (La.01/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). The reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. Id.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 1994-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.02/25/09), 3 So.3d 685, writ denied, 2009-0725 (La.12/11/09), 23 So.3d 913.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence, must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that a defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.01/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/06/09), 21 So.3d 299.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if *731 believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App.2d Cir.02/13/08), 975 So.2d 753.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, supra.
Brown’s trial included the admission of physical evidence as well as the testimony of 16 witnesses, many of whom were police officers involved |5in the investigation of the case. The summary of pertinent evidence is as follows.
Antonio Davis testified that he was present at Uncle Darrell’s when the shooting occurred. Davis testified that on the night of the shooting, his vehicle was parked near the entrance to Uncle Darrell’s on the north side of the building. According to Davis, he was standing by the driver’s side door of his vehicle talking with someone while his girlfriend made purchases inside the store. Davis further explained that King’s vehicle was parked several feet away from his own at the northeast corner of Uncle Darrell’s and that King sat inside the driver’s seat of the vehicle directly across from Davis. Davis testified that while speaking with someone, he saw a flash, heard a loud bang, and took cover on the opposite side of his vehicle. From there, he stated that he was able to see a person dressed in a dark hooded sweatshirt fire a gun into King’s vehicle at close range several times and then walk across the street to the back of a nightclub named the 20/20 Club. Davis told the jury that after the shooter walked behind the 20/20 Club, Davis was able to identify Brown’s car drive out from behind the nightclub and leave the scene.
Jerry Baker testified that he was working inside Uncle Darrell’s on the night of the shooting. Baker stated he knew both Brown and King and spoke with King inside the store 20 to 30 minutes before the shooting took place. Baker explained to the jury that he heard four gunshots, and he ran to the front of the store to prevent his son from going outside. While standing | fiat the front of the store, he witnessed a man in a dark hooded sweatshirt cross the street from Uncle Darrell’s to the 20/20 Club.
Kevin Powell was another eyewitness to the shooting. Powell testified that he and several others were standing near the front of Uncle Darrell’s adjacent to the east side of the building talking and smoking marijuana. Powell stated that he and King spoke briefly and then King drove off. Powell claims that King returned a few minutes later spinning his tires and playing loud music from his car stereo. Powell told the jury that King parked his vehicle near the northeast entrance of Uncle Darrell’s such that Powell was then standing nearest the passenger side of King’s vehicle. Powell testified that once King’s car came to a stop and the smoke from the car’s tires dissipated, Powell heard a gunshot and ducked down. Powell testified that as he looked through the passenger side window of King’s vehicle, he saw the following: Brown stand next to King’s driver’s side window; King look up into Brown’s aim; Brown shoot King; and, Brown pull the hammer back on a small black revolver, lean into the window, and shoot King a second time. Powell stated that Brown then placed the revolver into a dark hooded sweatshirt that he was wearing and walked away. Powell testified that earlier in the evening, Brown was wearing a lighter colored sweatshirt than the one he wore during the shooting. Powell also stated that Brown was wearing dark gloves when he shot King.
*732 Jermaine Carter also witnessed the shooting that night. Carter testified that prior to the shooting, he and Sheena Puckett witnessed Brown changing clothes from the trunk of his vehicle near the 20/20 Club. Carter |7stated that moments before the shooting, as Carter crossed the street from Uncle Darrell’s to the 20/20 Club, he passed by Brown who was heading in the opposite direction. Carter described Brown as wearing a dark camouflage hooded sweatshirt and a camouflage mask that covered the lower half of his face. Carter stated that as he and Brown passed in the street between Uncle Darrell’s and the 20/20 Club, he asked Brown what was going on, but Brown did not reply. Carter stated that shortly after he passed by Brown and proceeded toward the 20/20 Club, he heard a gunshot. Carter testified that he turned toward the noise and saw Brown standing near the driver’s side window of King’s vehicle firing a gun into it. Carter testified that after the shooting, Brown walked toward the 20/20 Club where Carter was standing and gestured for Carter to get into Brown’s car. Carter claims that he drove Brown’s car with Brown as a passenger from the scene of the crime and that Brown had him stop around the corner on First Street where Brown hid a small black revolver under a brush pile. Carter stated that after Brown hid the gun they continued down First Street. Near First and Hamley Street they almost got into an accident with another vehicle. In an effort to avoid the collision, Carter drove into a ditch alongside the road. Carter then testified that he fled the scene on foot once Brown’s vehicle was towed from the ditch.
Sheena Puckett also witnessed the shooting. Puckett claims that she and Carter both witnessed Brown changing his clothes out of the trunk of Brown’s vehicle from a light-colored hooded sweatshirt to a dark camouflage-colored hooded sweatshirt with a camouflage mask. Puckett Rnoted that she recognized Brown even with the mask, because he had worn the same mask to a Halloween party at her house several days earlier. Puckett testified that she saw Carter approach Brown between Uncle Darrell’s and the 20/20 Club, the two crossed paths in the street, and Brown told Carter, “Gone.” Puckett described Brown as then approaching King’s vehicle and shooting him through the driver’s side window four times. Puckett fled the scene after the shooting but later returned to retrieve her cell phone and clean up a cut she had on her arm from climbing over a fence as she ran away. On cross-examination, Puckett admitted to having drunk a pint of vodka and smoking two marijuana blunts before witnessing the shooting. However, she testified that she was not impaired such that she could not remember what took place that night.
At the time of the shooting, Off. Roger Wilson was employed as the Assistant Chief of Police in Lake Providence, Louisiana. Officer Wilson testified that when he arrived on the scene at 11:23 p.m., he observed King’s body sitting in a vehicle in front of Uncle Darrell’s with a gunshot wound to the left side of the face. Officer Wilson told the jury that while taking photos at the crime scene, he found in King’s car two cartridge casings which he placed in evidence bags after photographing them. One of the cartridge casings was found on King’s shoulder and the other on the floor of the vehicle between the driver’s seat and the door. Officer Wilson explained that once the Louisiana State Police arrived on the scene, he turned over the cartridge casings and his participation in the investigation was over. However, on cross examination, Off. Wilson admitted that he did |flnot turn the cartridge casings over to the state police at the scene but *733 may have taken them back to the police station where they were placed in an evidence locker and then later turned over to the Louisiana State Police.
Dr. Frank Peretti performed the autopsy on King and testified as an expert in forensic pathology. Dr. Peretti stated that King died from three large caliber gunshot wounds to the head. Dr. Peretti indicated that the amount of unburned powder around one of the wounds on King’s face indicated that the wound was caused by a shot fired approximately four inches away from King’s face. Dr. Peretti testified that the lack of powder or “stippling” around the other two wounds indicated that they were likely caused by gunshots fired more than 20 inches from King’s face.
Officer Todd Cummings of the Louisiana State Police was the lead investigator on the case. Officer Cummings testified that, with the help of Carter, he was able to locate a small black revolver hidden under a brush pile located near the scene of the shooting. Officer Cummings admitted that Carter was not initially truthful during the investigation and that Carter told investigators he fled the scene of the shooting on foot. However, after Off. Cummings confronted Carter with the fact that Off. Cummings had found Carter’s driver’s license near the area where Brown’s car had driven into a roadside ditch, Carter changed his story and led police to the location of the revolver. Officer Cummings also testified that upon a search of the residence where Brown was rumored to be living, officers located a mask fitting the description, given by Puckett and Carter, of the mask worn by Brown during the shooting. The mask was found between a mattress and | mboxspring in the master bedroom of the house. Later, testimony by DNA analyst Doris Hoffpauir proved that Brown was the last person to have worn the mask.
Jeff Goudeau, the supervisor of the physical evidence unit at the Louisiana State Police Crime Lab, testified as an expert in ballistics and fingerprint processing. Goudeau explained the methods used to determine whether a particular cartridge casing was fired by a specific gun. Goudeau testified that he conclusively determined that the cartridge casings found on the victim’s body were fired from the same gun that Off. Cummings recovered from the brush pile with the help of Carter. Goudeau testified that he had two theories as to how the cartridge casings were left at the scene. First, either the shooter removed the cartridge casings from the gun and left them at the scene or, second, the shooter had left the loading port on the revolver open, and after firing the revolver, the shooter pointed the gun upward, causing the cartridge casings to fall out of the gun. Goudeau also testified that the bullets recovered from King’s head by Dr. Peretti were too badly damaged to conclusively determine whether they had been fired from the gun recovered from the brush pile.
For the state to prove its case, it had to show that Brown had specific intent to kill King and did so. Considering the evidence presented at trial in a light most favorable to the prosecution, we conclude that the state provided evidence sufficient to convict Brown of the second degree murder of King.
|T1No less than five people witnessed the killing of King. Many of the witnesses independently verified that Brown was the shooter. The description of the shooter, while varying slightly due to acceptable differences in perception, remained constant throughout the testimony of each eyewitness. Furthermore, witnesses repeatedly testified to having seen a black revolver used to kill King. Officer Cummings recovered a black revolver and it *734 was determined by Goudeau as the weapon that fired the bullets from the casings found in King’s car. Two witnesses described Brown as wearing a mask during the shooting and a mask fitting that description was found hidden in the home where Brown was staying. DNA analysis conclusively proved that Brown was the last person to have worn the mask.
Defense counsel thoroughly cross-examined all witnesses and highlighted any alleged inconsistencies. The inconsistencies noted by defense counsel did not amount to drastic changes in testimony, but were more evident of slight differences in the ways in which questions were asked and answered. Although several of the witnesses were under the influence of drugs or alcohol when the shooting occurred, the impact of this fact is reduced considering that each witness gave a similar account of what occurred on the night November 12, 2008. The jury weighed the credibility of each witness and chose to believe the testimony of these witnesses. As stated above, a reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, supra. There is nothing in the record that warrants this court’s 112reversal of the jury’s determinations. This assignment of error is without merit.

Evidence of Others’ Motives to Kill Victim

In another assignment of error, Brown argues that the trial court erred by prohibiting him from presenting a full defense. Specifically, Brown argues that critical to his defense was his ability to prove, through pertinent character traits of the victim and the victim’s criminal record, that other people had a motive to kill the victim. The state filed a pretrial motion to prohibit the use of the victim’s criminal record during trial. The trial court ruled that Brown could not introduce evidence of the victim’s character without first establishing a proper foundation. Brown argues that the trial court’s pretrial ruling on the motion denied him of his constitutional right to present a complete defense. We disagree.
Louisiana C.E. art. 404(A)(2) governs admissibility of character evidence of a victim and states, in pertinent part:
(a) Except as provided in Article 412, evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible.
Both the Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to present a defense. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); State v. Van Winkle, 1994-0947 (La.06/30/95), 658 So.2d 198; State v. Johnson, 41,428 (La.App.2d13 Cir.09/27/06), 940 So.2d 711. However, the right to present a defense does not require the trial court to permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice. State v. Mosby, 595 So.2d 1135 (La.1992); State v. Laster, 44,870 (La.App.2d Cir.02/03/10), 33 So.3d 259. Where defense counsel fails to establish a foundation showing a connection between character evidence of the victim and the crime at trial, such character evidence is inadmissible absent other permissible grounds for admission. See State v. Flowers, 574 So.2d 448 (La.App.2d Cir.01/23/91).
*735 Here, Brown failed to proffer the evidence that he wished to introduce at trial. However, a review of the record indicates that the trial court granted the state’s pretrial motion, ruling that Brown could not admit evidence concerning the criminal history of the victim unless he first laid a foundation supporting the relevance of such character evidence. Effectively, the trial court did not prevent Brown from presenting a defense, because Brown failed to lay a foundation sufficient to support the admission of the victim’s criminal record. Therefore, this assignment of error is without merit.

Motion for Recusal

Brown argues that the division of the trial court which ruled on his motion to recuse erred in denying his motion. Brown submits that the 114involvement of the victim’s mother and grandmother in Judge Crigler’s campaign created the appearance of impropriety in the case. We disagree.
Louisiana C. Cr. P. art. 671 states, in pertinent part:
A. In a criminal case a judge of any court, trial or appellate, shall be recused when he:
(1) Is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial;
[[Image here]]
(6) Would be unable, for any other reason, to conduct a fair and impartial trial.
A trial judge is presumed to be impartial, and the burden is on the defendant to prove otherwise. State v. Dooley, 38,763 (La.App.2d Cir.09/22/04), 882 So.2d 731, writ denied, 2004-2645 (La.02/18/05), 896 So.2d 30. In order to obtain a recusation based on bias, prejudice, and personal interest, the party seeking the recusation must establish grounds of a substantial nature based on more than conclusory allegations. State v. White, 42,725 (La.App.2d Cir.10/24/2007), 968 So.2d 901.
Here, the defendant has asserted the victim’s mother and grandmother worked on Judge Crigler’s election campaign two years prior to the trial. There is no indication that Judge Crigler had any knowledge of their involvement in his election campaign. Furthermore, as the trial court on the -motion for recusal found, Judge Crigler had administered several trials since his election campaign involving members of the King family. One such trial resulted in a term of life imprisonment for a member of the King family. Brown failed to prove that Judge Crigler would be biased, | ^prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial. It was not error for the trial court to deny the motion.

Motion for Change of Venue

In another assignment of error, Brown argues that the trial court erred in denying his motion for change of venue due to pretrial publicity. Specifically, Brown claims that responses made by prospective jurors during voir dire indicated a high level of public awareness and notoriety surrounding the trial with the result that a fair and impartial trial could not be obtained in that venue.
Changes of venue are governed by La. C. Cr. P. art. 622 which states:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
*736 A defendant must prove more than mere public general knowledge or familiarity with the facts of the case to be entitled to a change of venue. State v. Sparks, 1988-0017 (La.05/11/11), 68 So.3d 435. The Supreme Court has enumerated some relevant factors used to determine whether a change of venue is necessary. State v. Bell, 315 So.2d 307 (La.1975). These factors are: (1) the nature of pretrial publicity and the particular degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the dissemination of the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) 11Rother events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and, (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. Id. A trial court is vested with great discretion in determining whether a change of venue is warranted. State v. Flood, 301 So.2d 637 (La.1974); State v. Walker, 28,577 (La.App.2d Cir.10/04/96), 681 So.2d 1023. Nevertheless, a reviewing court may make an independent evaluation of the record to determine whether the accused received a trial which was free and unfettered by outside influences. Walker, supra.
Upon review of the record, it appears that Brown failed to introduce any newspaper articles or other evidence concerning pretrial publicity or public opinion. The trial court based its decision solely on the responses given by prospective jurors during voir dire. The trial court noted that it “did not have that feeling of high electricity that you have sometimes when there is a lot of public sentiment about a case.” In addition, the trial court pointed out that prospective jurors appeared relaxed; a significant amount of time had passed since the murder and the trial; and, Brown did not have any special notoriety. We do not find a substantial basis for a finding that Brown was unable to receive a trial free and unfettered by outside influences. While some of the jurors mentioned that they had read about the incident in the local newspaper, all of these jurors indicated that the articles would have no bearing on their ability to remain impartial. This assignment of error is without merit.

117Challenges for Cause

Brown also argues that the trial court erred by denying his challenges for cause during voir dire. Brown claims that prejudice is presumed when a trial court erroneously denies a challenge for cause and the defendant ultimately exhausts his peremptory challenges in an attempt to cure the trial court’s error. Additionally, Brown claims that it is not possible to determine from the voir dire transcript which juror is speaking, because the court reporter left the names of the speakers blank during several points in the transcript and that this alone constitutes grounds for remand. We disagree.
Challenges for cause are governed by La. C. Cr. P. art. 797 which states:
The state or the defendant may challenge a juror for cause on the ground that:
(1) The juror lacks a qualification required by law;
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial *737 verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court; or
(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.
11sWhen appealing the denial of a challenge for cause, a defendant whose peremptory challenges have been exhausted need only show the erroneous denial of a challenge for cause; no showing of prejudice is required. State v. Hopkins, 39,730 (La.App. 2d Cir.08/17/05), 908 So.2d 1265, writ denied, 2005-2253 (La.03/17/06), 925 So.2d 541. However, the trial court has broad discretion in ruling on a challenge for cause, and the determination will not be disturbed unless a review of the entire voir dire indicates an abuse of discretion. State v. Lindsey, 2006-255 (La.01/17/07), 948 So.2d 105. A challenge for cause is not warranted when a prospective juror volunteers an opinion seemingly prejudicial to the defense but subsequently, on further inquiry, has demonstrated an ability and willingness to decide the case impartially according to the law and evidence. State v. Anderson, 2006-2987 (La.09/09/08), 996 So.2d 973, cert. denied, — U.S. -, 129 S.Ct. 1906, 173 L.Ed.2d 1057 (2009); State v. Wiley, 614 So.2d 862 (La.App. 2d Cir.1993).
The defendant characterized the following prospective jurors as suitable for cause challenge:

Linda Robinson Martin

Ms. Martin taught at a school where King’s children attended. Brown claims that it was error to deny this challenge for cause because of the parent-teacher relationship between King and Ms. Martin. However, Ms. Martin later testified that her relationship with King was purely professional, they were not close, and it would have no effect on her ability to remain impartial.

119Tiffany Nicole Moody

Ms. Moody claimed to have been a student of prosecutor Andy Brister; however, she did not discuss any detail as to the depth of the relationship. Brown claims that the teacher-student relationship would make it impossible for Ms. Moody to remain impartial because a teacher holds an inherent level of authority over the student. But, upon further questioning, Ms. Moody stated that this past relationship would have no bearing on her ability to be fair. Furthermore, there is no indication as to what stage in school Mr. Brister taught Ms. Moody.[1]

Sheila Marshall and Shirley Holden

Both Ms. Marshall and Ms. Holden stated that they taught at the same school that King attended. Brown claims that these witnesses might have sympathy for the victim “conscious or otherwise.” Further questioning revealed that neither Ms. Marshall nor Ms. Holden had any relation to the victim aside from the fact that they both worked at the same school while the victim was a student there. Both prospec *738 tive jurors stated that they would be capable of applying the law and evidence fairly.

Jacqueline Threats and Shirley Holden

Ms. Threats and Ms. Holden were both married to employees of a correctional facility. Ms. Threats originally stated that because of her husband’s work as a correctional officer, she would tend to favor law enforcement. However, she did eventually say that she could fairly apply |2nthe law and evidence. Neither Ms. Threats or Ms. Holden stated whether their husbands had any contact with the defendant in this case.

Shirley Bell Peeler

Ms. Peeler stated that she had read about the case in the newspaper and that she served the prosecutors chicken every Sunday as a result of her employment at Jong’s Deli. Both prosecutors denied ever going to Jong’s Deli on Sundays; however, Brown claims that Ms. Peeler’s perceived relationship between herself and the prosecutors is key and that this perception would create a tendency in Ms. Peeler’s mind to lend more credibility to the state. Upon questioning, Ms. Peeler stated that her relationship with the prosecutors would not cause her to place more credibility with the state.

Betty Stevenson Lee

Ms. Lee stated that she was related to King’s grandmother and had discussed the case with her at length. Ms. Lee also stated that she was a college student taking six credits. Brown argues that Ms. Lee’s personal relationship with the victim’s grandmother made her incapable of remaining impartial and that her college workload would distract her from her duties. However, Ms. Lee stated that she had no fixed opinion of the case.

Ashley Nicole Tuner

Brown claims that because Ms. Turner knew several of the witnesses in the case, had prior exposure through newspaper articles, and worked as a correctional officer, she was incapable of impartiality. However, Ms. Turner stated that she had not discussed the case with any of the witnesses l^and could remain impartial. Additionally, there was no indication that she had any contact with the defendant through her employment as a correctional officer.

Joseph Ross

Brown claims that Mr. Ross’s former employment as a sheriff’s deputy would prevent him from fairly applying the law and evidence. Mr. Ross stated that he could be fair and objective and there is no evidence in the record to indicate otherwise.

Frankie Stanfield

Brown argues that Ms. Stanfield admitted that her prior exposure to the case through newspaper articles could influence her decision in weighing the evidence. However, the trial court indicated that her statement was not sufficient to show that she would be partial as a result of pretrial publicity and that the statement was more of an offhand remark.

Frances Amacker

The record indicates that there were two prospective female jurors on the same panel with the last name Amacker. At times, it is unclear which Amacker the court is referring to during voir dire. Brown argues that Frances Amacker’s relation to the prosecution and the fact that the record was unclear as to which Amacker the trial court was referring to are grounds for error. Frances Amacker unequivocally stated that her relationship with the prosecution would not cause her to favor the prosecution.

122Robert B. Holt

Mr. Holt stated that he knew the victim’s grandmother and that one of the *739 state’s attorneys had represented him in a separate legal matter. On both counts, Mr. Holt stated that his ability to be fair would not be affected.

Kelvin Jamal Lane

Mr. Lane stated that he coached a baseball team in the same league as a team coached by the prosecutor. Mr. Lane also acknowledged that he knew of the victim but indicated that this relationship was not at all close and would have no effect on his ability to remain impartial.

Sandra B. Campbell

Ms. Campbell stated that she attended a church also attended by members of the victim’s family and that she knew one of the prosecutors through her employment with the East Carroll Parish Police Jury. Ms. Campbell stated that neither of the above relations would affect her ability to remain impartial.
Based on the foregoing analysis of the answers to questioning at voir dire, it appears the disputed challenges for cause were properly denied. The fact that many of the jurors were acquainted with the victim or his family, or with the prosecutors, did not indicate there was cause for their removal from the jury. Each of the questioned jurors declared, and the trial court was satisfied, that they could render an impartial verdict according to the law and the evidence. The trial judge was present and was able to make a determination that the jurors could be impartial. The trial court’s decision is given great deference, and absent an abuse of that discretion, we will not | ^reverse the decision. For the foregoing reasons, this assignment of error is without merit.

Crime Scene Photographs

Brown argues that the trial court erred by admitting gruesome, prejudicial photographs which were redundant in nature and whose probative value did not outweigh the prejudice to his case. We disagree.
Photographs are generally admissible if they illustrate any fact, shed any light upon an issue in the case, or are relevant to describe the person, thing or place depicted. State v. Washington, 30,-866 (La.App.2d Cir.08/19/98), 716 So.2d 936, writ denied, 1998-2473 (La.01/08/99), 734 So.2d 1229. The cumulative nature of photographic evidence does not render it inadmissible if it corroborates the testimony of witnesses on essential matters. State v. Langley, 1995-1489 (La.04/14/98), 711 So.2d 651. The admission of photographs is not reversible error unless it is clear that their probative value is substantially outweighed by their prejudicial effect. State v. Washington, supra.
The photographs objected to include one showing King’s body in the driver’s seat of his vehicle, one from the passenger seat showing King’s body slumped over, a close-up of a bullet wound to show powder burns, and one of King’s right hand showing blood spatters which indicate the velocity of the bullets. All four photographs were used during the testimony of the forensic pathologist to help explain the cause of death of the victim and to better illustrate the location of the shooter. Additionally, the photographs helped to corroborate eyewitness testimony concerning the events on the l^night of November 12, 2008. After a review of the record, we find that the prejudicial effect of the photographs does not outweigh their probative value. This assignment of error is without merit.

Use of Exhibits

Brown argues that the trial court erred by allowing the state to repeatedly reuse exhibits which had been marked by previous witnesses. Specifically, Brown argues *740 that allowing a witness to observe a demonstrative marked by a prior witness is the equivalent of allowing that witness to sit in the courtroom and listen to the testimony of the previous witness. Brown claims that it will never be clear to what extent the testimony of each subsequent witness is affected by viewing the placement of stickers by previous witnesses and, therefore, the trial court’s error materially prejudiced his case. We disagree.
Sequestration of witnesses is governed by La. C.E. art. 615(A) which states:
As a matter of right. On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interests of justice, the court may exempt any witness from its order of exclusion.
The purpose of sequestration is to assure that a witness testifies as to his own knowledge, to prevent witnesses from being influenced by the testimony of others, and to strengthen the role of cross-examination in developing facts. State v. Holden, 45,038 (La.App.2d Cir.01/27/10), 80 So.3d 1053, writ denied, 2010-0491 (La.09/24/10), 45 So.3d 1072. The | ¡.¿injured party must prove, by a preponderance of the evidence, that a sequestration order violation occurred and that the violation materially prejudiced his case. State v. Lucas, 39,419 (La.App.2d Cir.03/09/05), 896 So.2d 331. In examining sequestration violations, the reviewing court considers the facts of each case to determine whether or not prejudice resulted. State v. Barber, 30,019 (La.App.2d Cir.01/21/98), 706 So.2d 563, writ denied, 1998-1353 (La.10/09/98), 726 So.2d 24.
Here, the state introduced several large photographs which they used to assist witness testimony: state’s exhibit 5 depicted the front of Uncle Darrell’s where the shooting took place; state’s exhibit 6 depicted the 20/20 Club across the street from Uncle Darrell’s; and, state’s exhibit 8 was a large map of the area surrounding the scene of the shooting. On direct examination, the state instructed Puckett, Davis, and Powell, respectively, to place a sticker with their initials on state’s exhibit 5 in order to indicate where they were standing at the time of the shooting and another sticker to indicate where King’s car was located when the shooting occurred. On direct examination, the state instructed Carter to place a sticker with his initials on exhibit 6 to indicate the location where he picked up Brown and to place a sticker on exhibit 8 to indicate where the accident took place following the shooting.
Each successive witness had an opportunity to view the location that previous witnesses claimed to have been standing or claimed the victim to have been located. Although it does not appear that a witness could have known which question the previous witnesses’ stickers were in response to, |2na review of the record indicates that the state referred witnesses to specific stickers on exhibits that previous witnesses had marked during direct examination. Even if the state’s use of the demonstratives violated the sequestration order, it does not appear that the violation materially prejudiced the defendant’s case. The suggestiveness of the demonstratives was not to the level that would allow a witness to fully fabricate significant testimony. Witness testimony, unaffected by the use of the demonstratives, was sufficient to support a conviction of second degree murder. The prejudice to the defendant was not material; therefore, it *741 does not warrant reversal or remand. This assignment of error is without merit.
CONCLUSION
For the foregoing reasons, the conviction and sentence of Larry Richard Brown, are affirmed.
AFFIRMED.

. It is unclear from the transcript whether the trial court accepted or rejected the challenge for cause. We assume that the trial court rejected the challenge for cause because Brown used a peremptory challenge on Ms. Moody.